UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| WESLEY PIGOTT, on his own behalf and on behalf of his minor child K.P., and MYA PIGOTT,<br><br>Plaintiffs,<br><br>vs.<br><br>PAUL GINTZ (SHIELD NO. 91581),<br><br>Defendant. | Civil Action No. 1:21-CV-01015<br><br>Judge:<br><br>Magistrate Judge |

**COMPLAINT AND JURY DEMAND**

**Introduction**

This case involves a malicious, violent, and traumatizing incident, which began with the apparent racial profiling of children and escalated as both the children and their father were threatened at gunpoint. This incident is just one example of the troubling pattern of law enforcement officers criminalizing children of color. Research has shown that Black children are perceived as less innocent than white children,[1] leading to more frequent stops, prosecutions, and

---

[1] Phillip Atiba Goff, Matthew Christian Jackson, Brooke Allison Lewis Di Leone, Carmen Marie Culotta, & Natalie Ann DiTomasso, *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J.; *see also* Personality & Soc. Psychol. 526, 529, 540 (2014). Am. Values inst., Transforming Perception: Black Men and Boys 9-10 (mar. 2013), [https://perma.cc/B52W-EC52].

1

trials as adults.[2]  Further, implicit dehumanization of Black children makes them demonstrably more likely to be victims of police violence.[3]

On the day in question, Plaintiffs—Wesley Pigott (hereinafter "Mr. Pigott"), a white man, and his Black children, Mya Pigott, aged 17 at the time of the incident and currently 18, (hereinafter "Mya"), and K.P., aged 15 at the time of the incident and currently 16, (hereinafter "K.P.") (hereinafter collectively "the Pigotts")—suffered severe emotional distress after they were subjected to excessive force, assault, and battery by Paul Gintz (hereinafter "Defendant Gintz"), an employee with the Rapides Parish Sheriff's Office (hereinafter "RPSO").

On the evening of April 17, 2020, Mr. Pigott, while driving his F-250 truck, picked up K.P. and his two friends, after they had been fishing.  K.P.'s friends are Latino.  Mya sat in the passenger seat in the cab of the truck.  K.P. and his friends sat in the open bed of the truck, where they were visible to others.

As they drove through Alexandria, Mya asked her father if he could drive past the Rapides Parish Detention Center (hereinafter "the Detention Center"), a location she knew he frequented as part of his job, which involves employing incarcerated persons through a work release program.  Mr. Pigott agreed.  Without stopping, Mr. Pigott entered the parking lot of the Detention Center, turned the truck around, exited the Detention Center's parking lot, and drove away.

Seeing K.P. and his friends in the bed of Mr. Pigott's pickup, Defendant Gintz began to follow the vehicle in his unmarked F-150 truck.  After several minutes, Mr. Pigott pulled into an

---

[2]  Gary Ford, *The New Jim Crow: Male and Female, South and North, from Cradle to Grave, Perception and Reality: Racial Disparity and Bias in America's Criminal Justice System*, 11 Rutgers Race & L. Rev. 323 (2010); James Bell & Laura John Ridolfi, W. Haywood Burns Inst., *Adoration of The Question: Reflections on The Failure to Reduce Racial and Ethnic Disparities in the Juvenile Justice System* 3-5 (Shadi Rahimi ed., 2008).

[3]  Goff at 536.  In response to this known bias, Black children are also more likely to waive their rights during interactions with police—consenting to searches or speaking without an attorney—in an effort to demonstrate their innocence.  Tamar R. Birckhead, *The Racialization of Juvenile Justice and the Role of the Defense Attorney*, 58 B.C. L. Rev. 379 (2017) at 424.

empty parking lot. He stopped his vehicle to confirm that Defendant Gintz's F-150 was following him. Defendant Gintz's unmarked vehicle drove up right behind Mr. Pigott's then-parked F-250. Mr. Pigott proceeded to open the driver's door of his truck and step on the side-step bar.

Immediately, Defendant Gintz, without announcing his identity or providing any warning, exited his unmarked truck and stood behind the driver-side door with his gun drawn and commanded Mr. Pigott to "Get the fuck out of the truck and put your hands up!" Mr. Pigott, staring down the barrel of a gun, slowly put his hands up. As Defendant Gintz approached him, Mr. Pigott noticed Defendant Gintz was wearing what appeared to be a law enforcement uniform. Mr. Pigott then turned around as ordered by Defendant Gintz. The children, watching from the cab and bed of the truck, were visibly terrified by the sight of the gun pointed at Mr. Pigott. Defendant Gintz, now standing behind Mr. Pigott, continued to point his gun at Mr. Pigott's head.

K.P. repeatedly pleaded with Defendant Gintz: "Please don't shoot my daddy!" Fearing for her life, Mya ducked below the window of the cab to hide herself from the view of Defendant Gintz. In response to K.P.'s plea, Defendant Gintz pointed his gun at the children in the bed of the truck and told them to put their hands up. Mr. Pigott begged Defendant Gintz to "calm down." Defendant Gintz responded by again pointing his gun at Mr. Pigott and telling him: "I am going to blow your head off if you turn around." Mr. Pigott noticed the odor of alcohol on Defendant Gintz's breath and that his hand was shaking as he held his gun.

From the moment he exited his F-150 truck, Defendant Gintz was on his cell phone with an individual to whom he relayed his location and Mr. Pigott's license plate number. Minutes later, Deputy Lacaze arrived in a marked sheriff's car—all the while, Defendant Gintz still had his gun pointed at Mr. Pigott's back. Deputy Lacaze approached and patted down Mr. Pigott. Defendant Gintz then lowered his gun. Deputy Lacaze conducted a cursory search of Mr. Pigott's

vehicle, during which he requested that Mr. Pigott open a package that was in the back seat. Mr. Pigott consented to the search and opened the package for Deputy Lacaze. Deputy Lacaze then apologized to Mr. Pigott and told him he could continue on his way.

Unfortunately, an apology does not counteract the effects of this traumatic experience on the Pigotts. Violent encounters with the police negatively impact mental health, and can trigger symptoms of depression and PTSD, among other pernicious effects.[4] Incidents of perceived racial profiling adversely impact the mental health of people of color, especially among young people like K.P. and Mya.[5]

Indeed, as a result of the aforementioned constitutional violations, each of the Pigotts suffered grave emotional turmoil, especially the two children, Mya and K.P. In the immediate aftermath of the incident and continuing for several months, Mya Pigott was scared to sleep alone in her own home and was haunted by nightmares replaying the incident. She continues to struggle with emotional distress from the incident. K.P. also had significant difficulty sleeping and frequent nightmares related to the incident for several months. He has also suffered a loss of self-esteem and self-confidence and is now terrified of law enforcement. Further, K.P. no longer wants to become a game warden or engage in his favorite pastime, fishing. He too struggles to cope with continued emotional distress. As for Mr. Pigott, he has needed to provide additional care and

---

[4] *See, e.g.,* Sewell AA, Jefferson KA, Lee H. Living under surveillance: gender, psychological distress, and stop-and-frisk policing in New York City. Soc Sci Med. 2016;159:1-13. https://doi-org.proxy.library.upenn.edu/10.1016/j.socscimed.2016.04.024 https://www-sciencedirect-com.proxy.library.upenn.edu/science/article/pii/S0277953616301988?via%3Dihub; Amanda Geller PhD, Jeffrey Fagan PhD, Tom Tyler PhD, & Bruce G. Link PhD (2014) "Aggressive Policing and the Mental Health of Young Urban Men." American Journal of Public Health. 104(12): 2321-2327.

[5] *See, e.g*, Carter, R. T. (2007). Racism and psychological and emotional injury: Recognizing and assessing race-based traumatic stress. The Counseling Psychologist, 35(1), 13-105. doi:10.1177/0011000006292033 https://ucebt.com/images/pdfs-doc/Carter_2007.pdf; Jackson DB, Fahmy C, Vaughn MG, Testa A. Police stops among at-risk youth: repercussions for mental health. J Adolescent Health. 2019;65(5):627-632. https://doi.org/10.1016/j.jadohealth.2019.05.027.

support to his children as they grieve the incident. He also experiences difficulty sleeping and has had frequent nightmares replaying the incident. Believing the incident was racially-motivated, Mr. Pigott, a longtime supporter of law enforcement, no longer unequivocally trusts them in the same way.

The Pigotts seek relief for Defendant Gintz's violation of their rights secured by the Civil Rights Act of 1871, 42 U.S.C. §§1983 and 1988, the United States Constitution, including the Fourth and Fourteenth Amendments, and the laws of the State of Louisiana. At the time of the incident, Defendant Gintz acted under color of state law in the course and scope of his employment for RPSO.

## Jurisdiction and Venue

1. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws of the State of Louisiana. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 1343(3) and (4) and the aforementioned statutory provisions.

2. Plaintiffs invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all State law claims and causes of action that derive from the same nucleus of operative facts and are part of the same case or controversy giving rise to the federal claims and causes of action.

3. Venue is proper for the United States District Court for the Western District of Louisiana pursuant to 28 U.S.C. § 1391 (b)(2) because the wrongful conduct at issue in this matter occurred wholly within this district.

### Parties

4. Plaintiffs are Mr. Wesley Pigott (50 years old), on his own behalf and on behalf of his minor son K.P. (16 years old), and Ms. Mya Pigott (18 years old).

5. Defendant Paul Gintz is and was at all relevant times, an officer, employee, and agent of the RPSO and the Rapides Parish Detention Center. He is sued in his individual capacity.

### Statement of Facts

6. On the evening of April 17, 2020, Mr. Pigott drove his F-250 truck with Mya to pick up his son, K.P., and two of his friends, the three of whom had been fishing.

7. Mya and K.P. are Black.

8. K.P.'s friends are Latino.

9. After picking up K.P. and his two friends, Mya Pigott asked her dad to show her the local jail that he regularly frequented as part of his employment, which included assisting incarcerated individuals with work release programs.

10. While Mr. Pigott drove, Mya sat in the passenger seat of the truck; K.P. and his two friends sat in the open cargo bed of the truck.

11. Around 8:30, Mr. Pigott entered the parking lot area of the Detention Center located at 7400 Academy Drive in Alexandria, Louisiana.

12. Without stopping, Mr. Pigott drove through the Detention Center's parking lot near the pre-release area and exited.

13. After exiting the Detention Center, Mr. Pigott proceeded to the main highway, Coliseum Boulevard, towards central Alexandria.

14. After driving several miles down the Boulevard, Mya told her father that a vehicle had been following them since they exited the Detention Center.

15. Mr. Pigott switched lanes and noticed that the vehicle, an unmarked F-150 truck, followed him into the new lane.

16. When Mr. Pigott switched lanes again, the F-150 truck followed.

17. After approximately five minutes, the Pigotts reached central Alexandria, where they lived. The children were hungry, so Mr. Pigott decided to stop at the Popeyes located at 1001 MacArthur Drive.

18. The F-150 truck followed the Pigotts into the Popeyes' parking lot.

19. The drive-through line at Popeyes was long, so Mr. Pigott headed towards a different Popeyes (the "second Popeyes"); one located down the road at 3701 MacArthur Drive. The F-150 truck continued to follow Mr. Pigott to 3701 MacArthur Drive.

20. Before making it to the second Popeyes location, Mr. Pigott grew concerned that the F-150 truck was up to no good. He pulled into an empty parking lot adjacent to the highway and located at 1203 MacArthur Drive, in a commercial area and near the intersection of MacArthur Drive and Jackson Street.

21. The F-150 truck pulled into the empty parking lot and parked directly behind Mr. Pigott's parked truck.

22. Immediately after Mr. Pigott opened his door, the driver of the F-150 truck, Defendant Gintz, screamed "Get the fuck out of the truck and put your hands up!," while pointing a gun at Mr. Pigott from behind the open driver side door of the F-150 truck.

23. In his other hand, Defendant Gintz was holding a cellphone to his ear.

24. Defendant Gintz stepped out from behind the door of the F-150 truck. Continuing to point his gun at Mr. Pigott, Defendant Gintz walked towards him.

25. Mr. Pigott remained standing with his hands in the air and watched Defendant Gintz as he approached.

26. As Defendant Gintz stepped towards him, Mr. Pigott noticed that Defendant Gintz was wearing a tan uniform with a yellow sewn-on badge.

27. Defendant Gintz demanded Mr. Pigott turn around and keep his hands in the air. Mr. Pigott followed Defendant Gintz's demands and turned his back to Defendant Gintz.

28. Defendant Gintz continued to approach Mr. Pigott from behind him.

29. Within seconds, Mr. Pigott felt the barrel of Defendant Gintz's gun against the back of his head.

30. The proximity allowed Mr. Pigott to smell alcohol on Defendant Gintz's breath.

31. The children in the bed of the truck began to cry. K.P. yelled, "Please don't shoot my daddy!" several times.

32. Defendant Gintz responded by pointing his gun at K.P. and his two friends, all three of whom were still sitting in the open bed of Mr. Pigott's F-250 truck.

33. Defendant Gintz told K.P. and his friends to put their hands up.

34. K.P. noticed that Defendant Gintz's hands were visibly shaking.

35. Mr. Pigott turned to face Defendant Gintz at this point and asked him to "calm down."

36. Like his son, Mr. Pigott noticed that Defendant Gintz's hands were visibly shaking.

37. Defendant Gintz pointed the gun back at Mr. Pigott, commanding the latter to turn around and not look at him, adding, "I am going to blow your head off if you turn around."

38. Defendant Gintz continued his conversation with someone on the cell phone, which was pressed to his ear.

39. Minutes after Mr. Pigott had exited his truck and was still being held at gun point, a marked Deputy Sheriff's vehicle pulled into the parking lot.

40. Deputy Lacaze arrived at the scene and was wearing a body camera[6].

41. Deputy Lacaze approached and patted down Mr. Pigott.

42. Defendant Gintz lowered his gun.

43. Mr. Pigott realized that he knew who Defendant Gintz was after he had the opportunity to look at him without a gun being pointed at him or his children. Indeed, they had been in contact at his former workplace, a chain of restaurants called Huddle House, where two work release prisoners were employed.

44. Mr. Pigott remembered going to the Detention Center and interacting with Defendant Gintz, who signed the work release orders for the Huddle House employees.

45. Mr. Pigott directly addressed Defendant Gintz and reminded him how they knew each other.

46. Mr. Pigott also willingly gave permission to Deputy Lacaze to search his truck.

47. Deputy Lacaze conducted a cursory search of the vehicle with a flashlight and asked Mr. Pigott to open up a package that was in the back seat. Mr. Pigott opened the package and invited a more thorough search. Deputy Lacaze declined to do so.

48. After searching Mr. Pigott's truck, Deputy Lacaze and Defendant Gintz walked over to confer near Deputy Lacaze's car.

49. While the two officers were conferring, another marked Sheriff's vehicle entered the parking lot.

---

[6] Accompanying this Complaint is the video captured from Deputy Lacaze's body camera. The video, which runs approximately 9 minutes and 26 seconds, begins when Deputy Lacaze arrives in the parking lot and Defendant Gintz is pointing his gun at Mr. Pigott. The video ends after Deputy Lacaze informs Mr. Pigott he is free to leave and then walks back to Defendant Gintz and the other officer who arrived.

50. An officer exited the marked car and approached to confer with Defendant Gintz and Deputy Lacaze.

51. Deputy Lacaze then walked back over to Mr. Pigott's car.  Deputy Lacaze apologized to Mr. Pigott and told him he was free to leave.

52. Since the incident, the Pigotts have suffered ongoing emotional distress.

53. Mr. Pigott continues to suffer ongoing emotional distress, including overwhelming guilt, sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares, avoidance behavior, hypervigilance, and irritability.

54. Mya continues to suffer ongoing emotional distress, including nightmares and a fear of sleeping alone.

55. K.P. continues to suffer ongoing emotional distress, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares, avoidance behavior, irritability, and hypervigilance.  He has given up on his dream of becoming a game warden because he no longer trusts law enforcement.

56. As a direct and proximate consequence of the aforementioned actions by Defendant, Mr. Pigott, Mya, and K.P.:

    (1) Suffered severe emotional and mental anguish and pain;
    (2) Suffered psychological injuries;
    (3) Were denied their constitutional rights and liberties; and
    (4) Continue to suffer from psychological injuries, emotional and mental anguish and pain.

## COUNT I
**Violation Under 42 U.S.C. § 1983 - Excessive Force**
(Against Defendant Paul Gintz)

57. The Pigotts repeat and reallege each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

58. The Pigotts are United States citizens and Defendant Paul Gintz is a person for purposes of 42 U.S.C. § 1983.

59. Defendant Gintz, at all times relevant hereto, was acting under the color of state law in his capacity as an RPSO officer. His acts and omissions were conducted within the scope of his official duties or employment.

60. At the time of the complained-of events, the Pigotts had clearly established constitutional rights under the Fourth Amendment to be secure in their persons from unreasonable seizure through excessive force.

61. The Pigotts also had the clearly established constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

62. Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained-of conduct as they were clearly established at that time.

63. Defendant Gintz's actions and use of force, as described herein, were malicious and involved reckless, callous, and deliberate indifference to the Pigotts' federally protected rights. The force used by Defendant Gintz was unconscionable and disproportionate to the conduct at issue.

64. Defendant Gintz's actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him and he accordingly violated the Pigotts' Fourth Amendment rights.

65. Defendant Gintz engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard for the Pigotts' federally protected constitutional rights.

66. Defendant Gintz did so with shocking and willful indifference to the Pigotts' rights and was consciously aware that his actions could cause the Pigotts' physical and emotional injuries and other damages.

67. Defendant Gintz used excessive force against the Pigotts without provocation and without legitimate legal justification.

68. The acts and omissions of Defendant Gintz were moving forces behind the Pigotts' injuries.

69. Defendant Gintz is not entitled to qualified immunity for the complained-of conduct, as his conduct violated the Pigotts' constitutional rights and was objectively unreasonable.

70. As a proximate result of Defendant Gintz's unlawful conduct, the Pigotts suffered actual emotional injuries, and other damages and losses as described herein—entitling them to compensatory and special damages, in amounts to be determined at trial.

71. The Pigotts are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

72. In addition to compensatory, economic, consequential and special damages, the Pigotts are entitled to punitive damages against Defendant Gintz under 42 U.S.C. § 1983, as Defendant Gintz acted with a malicious, willful, and reckless disregard to the Pigotts' constitutional rights.

## COUNT II
### Violation Under 42 U.S.C. § 1983 - Unlawful Seizure
(Against Defendant Paul Gintz)

73. The Pigotts repeat and reallege each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

74. At the time of the complained-of events, the Pigotts had clearly established constitutional rights under the Fourth Amendment to be secure in their persons from unreasonable seizure.

75. Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained-of conduct as they were clearly established at that time.

76. Defendant Gintz's actions and omissions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him.

77. Defendant Gintz engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard for the Pigotts' physical and emotional injuries.

78. The acts and omissions of Defendant Gintz were the moving force behind the Pigotts' injuries.

79. The acts and omissions of Defendant Gintz, as described herein, intentionally deprived the Pigotts of their constitutional rights.

80. Defendant Gintz is not entitled to qualified immunity for the complained-of conduct, as his conduct violated the Pigotts' constitutional rights and was objectively unreasonable.

81. As a proximate result of Defendant Gintz's unlawful conduct, the Pigotts suffered actual emotional injuries, and other damages and losses, as described herein—entitling them to compensatory and special damages, in amounts to be determined at trial.

82. The Pigotts are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

83. In addition to compensatory, economic, consequential and special damages, the Pigotts are entitled to punitive damages against Defendant Gintz under 42 U.S.C. § 1983, as Defendant Gintz acted with malicious, willful, and reckless or wanton disregard for the Pigotts' constitutional rights.

## COUNT III
### Intentional Infliction of Emotional Distress
(Against Defendant Paul Gintz)

84. The Pigotts repeat and reallege each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

85. The Pigotts assert violations of Louisiana law relative to intentional torts by Defendant Gintz who was acting within the course and scope of his employment with RSPO.

86. The acts and omissions of Defendant Gintz, as described herein, deprived the Pigotts of their constitutional rights and caused them other damages.

87. As a direct and proximate result of the intentional acts of Defendant Gintz described herein, carried out in reckless disregard, falsity and/or without sufficient factual information, the Pigotts suffered psychiatric distress, and continue to suffer from severe shock, distress, anguish, sorrow, and loss of enjoyment of life.

88. The aforesaid psychological injuries sustained by the Pigotts were caused wholly by reason of the intentional, reckless acts of Defendant Gintz, as described herein.

89. Defendant Gintz engaged in extreme and outrageous conduct and acted maliciously and with specific intent to oppress and harm the Pigotts and/or with reckless disregard for the

consequences of his actions and omissions—all of which entitle the Pigotts to damages in an amount to be proven at trial.

## COUNT IV
### Negligent Infliction of Emotional Distress
(Against Defendant Paul Gintz)

90. The Pigotts repeat and reallege each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

91. The Pigotts assert violations of Louisiana law relative to negligent torts by Defendant Gintz who was acting within the course and scope of his employment with RPSO.

92. The acts and omissions of Defendant Gintz, as described herein, deprived the Pigotts of their constitutional rights.

93. Defendant Gintz breached his duty of care to the Pigotts resulting in harm to them within the scope of the protection of the duty he owed to them.

94. As a result of Defendant Gintz's acts and omissions, the Pigotts suffered psychiatric distress, and continue to suffer from severe shock, distress, anguish, sorrow, and loss of enjoyment of life.

95. The aforesaid psychological injustices sustained by the Pigotts were caused wholly by reason of the negligent acts of Defendant Gintz as described herein.

96. Defendant Gintz acted with reckless disregard for the consequences of his actions and omissions, entitling the Pigotts to damages in an amount to be proven at trial.

## COUNT V
### Assault
(Against Defendant Paul Gintz)

97. The Pigotts repeat and reallege each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

98. The Pigotts assert violations of Louisiana law relative to intentional torts by Defendant Gintz of RPSO. Defendant Gintz was acting within the course and scope of his employment with RPSO.

99. Defendant Gintz threatened to cause physical injury to the Pigotts with the use of a gun, which is a dangerous weapon.

100. By pointing the gun at the Pigotts, Defendant Gintz not only threatened to cause physical injury, he also had the ability to cause physical injury to the Pigotts.

101. The Pigotts feared for their lives when Defendant Gintz pointed his gun at them.

102. The acts and omissions of Defendant Gintz, as described herein, deprived the Pigotts of their constitutional rights.

103. As a direct and proximate result of the intentional acts of Defendant Gintz described herein, the Pigotts suffered emotional injury, and psychiatric distress. They continue to suffer from severe shock, distress, anguish, sorrow, and loss of enjoyment of life.

104. The aforesaid physical and psychological injuries sustained by the Pigotts were caused wholly by reason of the intentional acts of Defendant Gintz as described herein.

105. By pointing his gun at the Pigotts, Defendant Gintz engaged in extreme and outrageous conduct, acting maliciously and with specific intent to oppress and harm the Pigotts—entitling them to damages in an amount to be proven at trial.

### COUNT VI
**Battery**
(Against Defendant Paul Gintz)

106. Mr. Pigott repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

107. Mr. Pigott asserts violations of Louisiana law relative to intentional torts by Defendant Gintz of RSPO. Defendant Gintz was acting within the course and scope of his employment with RPSO.

108. Defendant Gintz used a gun, which is a dangerous weapon, to make offensive contact with Mr. Pigott by placing the gun on the back of Mr. Pigott's head.

109. The aforesaid emotional and psychological injuries sustained by Mr. Pigott were caused wholly by reason of the intentional acts of Defendant Gintz as described herein.

110. Defendant Gintz engaged in extreme and outrageous conduct, acting maliciously and with specific intent to oppress and harm Mr. Pigott—entitling him to damages in an amount to be proven at trial.

**WHEREFORE**, the Pigotts request the following relief against Defendant Paul Gintz:

   a) Compensatory damages;
   b) Declaratory relief;
   c) Punitive damages;
   d) Reasonable attorneys' fee and costs;
   e) Pre-judgment interest; and
   f) Such other relief as this Court may deem just and proper.

Dated: April 16, 2021                               Respectfully Submitted,

/s/ Stephanie Willis
Stephanie Willis
swillis@laaclu.org
LA. Bar No. 31834
Nora Ahmed (*pro hac vice application forthcoming*)
Nahmed@laaclu.org
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Suite 2160
New Orleans, Louisiana 70112
Telephone: (504) 522-0628

*and*

Jennifer R. Louis-Jeune (*pro hac vice application forthcoming*)
LAW OFFICE OF JENNIFER R. LOUIS-JEUNE
217 Broadway, Suite 707
New York, New York 10007
Telephone: (212) 619-3730
jennifer@jljlaw.com

Anthony Ceutti (*pro hac vice application forthcoming*)
LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Telephone: (212) 619-3730
anthonycecutti@gmail.com

Anna Sideris (*pro hac vice application forthcoming*)
QUIJANO, ENNIS & SIDERIS
350 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 686-0666
annasideris@yahoo.com

*Counsel for Plaintiff*