## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

**WESLEY PIGOTT, ET AL**            **CIVIL DOCKET NO. 1:21-CV-01015**

**VERSUS**                          **JUDGE DAVID C. JOSEPH**

**PAUL GINTZ**                      **MAGISTRATE JUDGE JOSEPH H. L.
                                    PEREZ-MONTES**

### MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") [Doc. 29] filed by Defendant Paul Gintz ("Defendant" or "Deputy Gintz"). Deputy Gintz seeks summary judgment with respect to all claims asserted by Plaintiff Wesley Pigott ("Mr. Pigott"), his daughter, Mya Pigott ("Mya"), and his minor son, K.P. (collectively, "Plaintiffs"), on grounds he is entitled to qualified immunity. For the reasons that follow, the Defendant's Motion is GRANTED.

### FACTUAL HISTORY

On the night of April 17, 2020, Plaintiffs drove home from the Oakwing Golf Club in Alexandria, Louisiana, where K.P. and two of his friends had been fishing.[1] Mr. Pigott drove the group; Mya sat in the passenger seat and K.P. and two of his friends rode in the bed of Mr. Pigott's truck.[2] As Plaintiffs approached Highway 28, Mya asked her father if they could pass by the Rapides Parish Detention Center (the

---

[1]  *See* Deposition of Wesley Pigott, attached as Exhibit 2 to Defendant's Motion for Summary Judgment. [Doc. 29-5, p. 10].

[2]  *Id.* at p. 26.

"Detention Center") located nearby.[3]   Mr. Pigott agreed, driving slowly into the parking lot of the Detention Center, making a circle, and then driving slowly out.[4]

Deputy Gintz was a deputy sheriff with the Rapides Parish Sheriff's Office ("RPSO") and had served as a corrections officer for the RPSO for approximately fifteen years.  On the night of April 17, 2020, he was serving as the shift supervisor at the Detention Center and was wearing his duty uniform.[5]  At some point during the evening hours of Deputy Gintz's shift, Deputy Jessie Sanchez, who was standing outside of the facility but inside the fence, observed a truck drive slowly into the Detention Center parking lot and make a circle.[6]  Deputy Sanchez testified at his deposition that "at that time of that night, it was suspicious" to him that a truck had driven into the parking lot.[7]  Deputy Sanchez called Deputy Gintz and told him that he had seen a vehicle pull into the parking lot and had seen a silhouette of a person in the back of the truck.[8]   Concerned because there had been recent incidents

---

[3]      *Id.* at p. 32.  Mr. Pigott testified that he worked at the Huddle House Restaurant at the time of the incident, a local restaurant that uses a work-release program to employ prisoners housed at the Detention Center.  *Id.* at pp. 6–7.  In her deposition, Mya explained that her father's work with prisoners made her curious about the location of the Detention Center.  *See* Deposition of Mya Pigott, attached as Exhibit 3 to Defendant's Motion for Summary Judgment.  [Doc. 29-6, p. 13].

[4]      *See* Deposition of Wesley Pigott.  [Doc. 29-5, p. 10].

[5]      *See* Deposition of Paul Gintz, attached as Exhibit 5 to Plaintiffs' Response to Motion for Summary Judgment.  [Doc. 41-5, p. 90].

[6]      *Id.* at pp. 91-92.  *See also* Deposition of Jessie Sanchez, attached as Exhibit 7 to Defendant's Motion for Summary Judgment.  [Doc. 29-10, p. 23].

[7]      *See* Deposition of Jessie Sanchez.  [Doc. 29-10, p. 23].

[8]      *Id.* at p. 20.

involving people driving onto Detention Center property and throwing contraband over the fence, Deputy Gintz instructed that the Detention Center be locked down and ordered correctional officers to perform a head count of all inmates.[9]   Deputy Gintz then exited the Detention Center and arrived in the parking lot as the truck was pulling away.  Although he had been told there was one person in the bed of the truck, Deputy Gintz observed *three* individuals in the bed of the truck as it pulled out onto the highway.[10]   At that point, because he did not have keys to a marked police vehicle and because he thought it would take too much time to retrieve them, Deputy Gintz, who was in uniform, got into his personal vehicle and followed the Plaintiffs as they drove away from the Detention Center.[11]   Shortly thereafter, Deputy Gintz called the front desk of the Detention Center and asked for a backup unit.[12]

Deputy Gintz followed the Plaintiffs for approximately seven to ten minutes.[13] Deputy Gintz testified that as he pulled up behind the truck at a red light, he observed that the three persons in the bed of the truck were juveniles.[14]  Mr. Pigott testified that he drove the wrong way down a one-way street to see if the vehicle

---

[9]      *See* Deposition of Paul Gintz.  [Doc. 41-5, p. 93].

[10]      *Id.* at p. 95.

[11]      *Id.* at p. 93.

[12]      *Id.* at p. 104.

[13]      *Id.* at pp. 110-111.

[14]      *Id.* at pp. 95-96.

behind him would continue to follow him.[15]  At some point after being followed, Mr. Pigott voluntarily decided to pull over into an empty parking lot.[16]  Deputy Gintz parked behind Mr. Piggott's truck and exited his vehicle.[17]

The parties dispute what happened next.  According to Deputy Gintz, once both vehicles were parked, Mr. Pigott got out of his truck but was "leaning to his vehicle," and had his back to Deputy Gintz.[18]  According to Deputy Gintz, because he could not see Mr. Pigott's hands, he gave several commands to Mr. Pigott to show his hands, but Mr. Pigott failed to comply.[19]  Deputy Gintz testified that he commanded Mr. Pigott to turn around but Mr. Pigott continued to not comply.[20]  Deputy Gintz testified that he could not see in the back seat of the truck and did not know who else might be in the vehicle.[21]  Deputy Gintz testified that after Mr. Pigott failed to comply with several commands, he drew his gun at a "low point," and testified that it was not until another law enforcement officer, Deputy Lacaze, arrived in his marked police unit

---

[15]    *See* Deposition of Wesley Pigott.  [Doc. 41-2, pp. 39–40].

[16]    *Id.* at pp. 39-40.

[17]    *See* Deposition of Paul Gintz.  [Doc. 41-5, p. 112].

[18]    *Id.* at p. 105.

[19]    *Id.* at p. 111.

[20]    *Id.* at pp. 111-112.

[21]    *Id.* at pp. 105-109, 113.

that Mr. Pigott complied by showing his hands.[22]   Deputy Gintz maintains that

throughout this exchange he kept his gun in the "low ready position."[23]

The Plaintiffs' version of this exchange is different.  Mr. Pigott testified at his

deposition that, when the parties stopped in the parking lot, he got out of his truck,

looked back, and saw Deputy Gintz pointing a gun at him, saying, "Get the fuck out

of the truck."[24]   Plaintiffs allege that Mr. Pigott immediately complied by putting his

hands up, and the other occupants of the vehicle put their hands up as well, as follows:

> Immediately after Defendant Gintz exited his truck, he pointed his gun
> at Mr. Pigott.  The first command that Defendant Gintz gave Mr. Pigott
> was "get the fuck out of the truck" and to put his hands up.  Mr. Pigott
> instantaneously obeyed Gintz's verbal commands.  Defendant Gintz
> then pointed the gun at the children and told them to get their hands
> up, which they instantaneously did.  Gintz never identified himself as
> law enforcement.

> After Mr. Pigott and the children complied with Gintz's commands to
> put their hands up, Defendant Gintz moved closer and pointed his gun
> at Mr. Pigott's forehead, between his eyes, from about two feet away.

> . . . . Gintz told Mr. Pigott to turn around.

> Mr. Pigott turned around as instructed … and was at this point facing
> away from Defendant Gintz.  As Defendant Gintz approached Mr.
> Pigott, he asked Mr. Pigott a series of questions while continuously
> pointing the gun at the back of Mr. Pigott's head as the children
> watched.  Then Defendant Gintz pressed the barrel of the gun against
> the back of Mr. Pigott's head. … As Defendant Gintz continued to

---

[22]   *Id.* at p. 105.

[23]   *Id.* at pp. 106-107.  Deputy Lacaze defined "low ready position" as follows: "That's just having your weapon ready.  It's not pointed at anyone.  It's just kind of pointed down toward the ground area just in a ready position.  It's not in your holster, but it's not pointed at anyone."  *See* Deposition of Clayton Lacaze.  [Doc. 29-9, p. 27].

[24]   *See* Deposition of Wesley Pigott.  [Doc. 29-5, pp. 42-43].  *See also* Complaint.  [Doc. 1, § 22].

question Mr. Pigott, Mr. Pigott turned to answer but Defendant Gintz yelled out, "If you turn around again, I'm going to blow your fucking head off."[25]

Mya testified that, while Deputy Gintz was pointing his gun at her father, she went to jump into the back seat of the truck, at which point Deputy Gintz pointed his gun at her and told her to put her hands up.[26]  K.P. testified that Deputy Gintz did not "point" his gun at him, but rather, that Deputy Gintz's action was "a swing" of the gun "at all of us.  Told us to keep our hands up."[27]  He testified that the gun was "swung" in his direction for approximately one second.[28]  Deputy Gintz denies that he pointed his gun between Mr. Pigott's eyes and pressed his gun to the back of his head.[29]

Shortly thereafter, Deputy Clayton Lacaze ("Deputy Lacaze"), wearing a body camera ("bodycam"), arrived on the scene in a marked vehicle.[30]  Deputy Lacaze's bodycam shows Mr. Pigott and Deputy Gintz standing three-to-four feet apart, with Mr. Pigott facing away from Deputy Gintz, who is holding his firearm in the "low ready position" with the barrel pointed towards Mr. Pigott.[31]  The driver-side door of

---

[25]     *See* Memorandum in Opposition to Motion for Summary Judgment.  [Doc. 41, pp. 11-12] (internal citations omitted).

[26]     *See* Deposition of Mya Pigott.  [Doc. 29-6, p. 62].

[27]     *See* Deposition of K.P.  [Doc. 29-7, p. 60].

[28]     *Id.*

[29]     *See* Deposition of Paul Gintz.  [Doc. 41-5, p. 108].

[30]     The body camera video is attached to Defendants' Motion for Summary Judgment as Exhibit 9A.  [Doc. 29-3].

[31]     *See* body cam video.

Mr. Pigott's vehicle was open, and Mya can be seen sitting in the passenger seat. Two of the three juveniles sitting in the bed of Mr. Pigott's truck are likewise visible. The footage then shows that Deputy Lacaze patted Mr. Pigott down while questioning him about his activities at the Detention Center.[32]  After Deputy Lacaze finished searching Mr. Pigott's person, Deputy Gintz holstered his weapon, and both officers questioned Mr. Pigott about driving onto the premises of the Detention Center at night and unannounced.[33]  Deputy Lacaze told Mya that she could put her hands down, and the officers explained to Mr. Pigott that they previously had problems at the Detention Center with people driving by and throwing contraband over the fence.[34]  Mr. Pigott acknowledged that his actions at the Detention Center might seem suspicious, but he assured both officers that he had not engaged in illegal activity. Deputy Gintz and Deputy Lacaze walked away from Mr. Pigott and engaged in a discussion between themselves, wherein Deputy Gintz explained to Deputy Lacaze what had transpired.  Deputy Gintz stated that he believed Mr. Pigott's story.[35]  The Plaintiffs were then allowed to leave the scene.

---

[32]   *Id.*

[33]   *Id.*

[34]   *Id.*

[35]    During this exchange between Deputy Gintz and Deputy Lacaze, Deputy Gintz explained the manner in which he was informed about the truck entering the property and driving slowly in a circle; the fact that Deputy Gintz did not have enough time to take a police vehicle; and his concerns that the truck contained individuals throwing contraband over the fence.  After this discussion is over, Deputy Lacaze and Deputy Gintz allow Plaintiffs to leave the parking lot.  *See* body camera video.

From the time that Deputy Lacaze arrived on the scene, his body camera captured approximately eight minutes of footage.[36]  Prior to that, Deputy Gintz testified that he was alone waiting for backup for no more than two to three minutes,[37] putting the entirety of the encounter in the parking lot at approximately eleven minutes.

## PROCEDURAL HISTORY

On April 16, 2021, Mr. Pigott filed suit on behalf of himself and his minor child, K.P., against Deputy Gintz in his individual capacity, alleging civil rights violations under the Fourth and Fourteenth Amendments to the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988 for excessive force and unlawful seizure, as well as state law claims of assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.[38]  Mya Pigott joined the lawsuit as a plaintiff as well.  Plaintiffs seek damages, including punitive damages and attorneys' fees and costs, for the foregoing violations.

On April 19, 2023, Deputy Gintz filed the instant Motion for Summary Judgment [Doc. 29] seeking dismissal of all Plaintiffs' claims on grounds he is entitled to qualified immunity.  Plaintiffs opposed the Motion [Doc. 41]; Deputy Gintz filed a

---

[36]     *See* body camera video.

[37]     *See* Deposition of Deputy Gintz.  [Doc. 41-5, pp. 106-107].

[38]     The Plaintiffs' Complaint contains numerous references to the races of the parties, as well as a discussion of racial profiling and its effect on black children.  But there are no causes of action alleging racial discrimination and the record is devoid of any facts or reasonable inferences that would support a racial animus behind the events at issue.  The Court need not address this issue further.

Reply [Doc. 45]; and Plaintiffs filed a Sur-Reply [Doc. 48].  The Motion is now ripe for ruling.

**LAW & ANALYSIS**

## I.    **Summary Judgment Standard**

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact but need not negate every element of the nonmovant's claim. *Hongo v. Goodwin*, 781 F. App'x 357, 359 (5th Cir. 2019) (citing *Duffie v. United States*, 600 F. 3d 362, 371 (5th Cir. 2010)).  If the movant meets this burden, the burden then shifts to the nonmovant who is required to "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d

293, 301 (5th Cir. 2004).  However, summary judgment cannot be defeated through "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002)).

In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The motion for summary judgment should be granted if the non-moving party cannot produce sufficient competent evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## II.   <u>Section 1983 Claims</u>

Plaintiffs allege that the actions of Deputy Gintz constituted an unlawful seizure and that the force used by Deputy Gintz was excessive and violated their clearly established right to be free from such force.  Deputy Gintz seeks summary judgment on both claims on the grounds he is entitled to qualified immunity.

The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727,

73 L.Ed.2d 396 (1982).  "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 685, 129 S. Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (internal quotations and citations omitted).  A qualified immunity defense is thus "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009).

When reviewing a motion for summary judgment, the court must view all of the facts in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor.  But an assertion of qualified immunity alters the standard.  Once qualified immunity is asserted, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017).  Nonetheless, all factual inferences are to be viewed by the Court in the light most favorable to the plaintiff. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

When there is video evidence, a court is not required to favor a plaintiff's allegations over the video evidence." *Brown v. Coulston*, 463 F. Supp. 3d 762, 769 (E.D. Tex. 2020), *citing Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (citations omitted) (per curiam), *citing Scott v. Harris*, 550 U.S. 372, 380–81, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007).  *Accord Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017), *citing Hanks v. Rogers*, 853 F.3d 738, 744 (quoting *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) ("a plaintiff's version of the facts should not be accepted

for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings."); *Terrell v. Town of Woodworth*, No. 1:21-CV-04224, 2023 WL 4115769, at *6 (W.D. La. June 7, 2023), *report and recommendation adopted*, No. 1:21-CV-04224, 2023 WL 4115879 (W.D. La. June 21, 2023) ("Where there is a video recording of the events in question, the Court should analyze the video evidence and reject the plaintiff's account only where the video evidence so clearly discredits the plaintiff's story that no reasonable juror could believe the plaintiff's version of the events.").

In determining the application of qualified immunity, courts engage in a two-step analysis. First, they assess whether a statutory or constitutional right would have been violated on the facts alleged. *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004). Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* (citations and quotations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (citations and quotations omitted). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and quotations omitted). The two steps of the qualified immunity inquiry may be performed in any order. *Pearson*, 555 U.S. at 236, 129 S. Ct. 808.

A.      <u>**Unlawful Seizure**</u>

Fourth Amendment protections attach "whenever a police officer accosts an individual and restrains his freedom to walk away." *Lincoln v. Turner*, 874 F.3d 833, 844 (5ᵗʰ Cir. 2017), *quoting Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).  Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).  The rule of *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968) represents "a very narrow exception." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014), *citing United States v. Tookes,* 633 F.2d 712, 715 (5th Cir.1980).

To analyze the legality of a vehicle stop under *Terry*, the Court must follow a two-step process, as follows: (i) the first step considers whether the officer was justified in stopping the vehicle at its inception; and (ii) the second step examines whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).

In the context of the first prong, "[p]olice may detain an individual if the officer has a reasonable suspicion based on specific and particularized facts that the person is involved in criminal activity." *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014), *citing Terry*, 392 U.S. at 21–22, 27, 88 S. Ct. 1868.  *See also United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L.Ed.2d 604 (1985).  It is well-settled

in the Fifth Circuit that reviewing courts making reasonable suspicion determinations "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Pack*, 612 F.3d 341, 352 (5th Cir.), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010), *citing United States v. Arvizu,* 534 U.S. 266, 122 S. Ct. 744, 750, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted). In evaluating whether an officer's suspicion is reasonable, "due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Pack,* 612 F.3d at 352, *citing Terry,* 88 S. Ct. at 1883. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu,* 122 S. Ct. at 751 (internal citations and quotation marks omitted). Finally, a *Terry* "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop...." *U.S. v. Banuelos–Romero*, 597 F.3d 763, 766-67 (5th Cir. 2010), *citing Brigham,* 382 F.3d at 507.

Because a "seizure" under the Fourth Amendment must be "justified at its inception," this Court first must determine when Plaintiffs were "seized" for purposes of the Fourth Amendment. *Hill*, 752 F.3d at 1033, *citing Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 185, 124 S. Ct. 2451, 159 L.Ed.2d 292 (2004). A seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave." *INS v. Delgado,* 466 U.S.

210, 215, 104 S. Ct. 1758, 80 L.Ed.2d 247 (1984) (citation omitted); *United States v. Mask,* 330 F.3d 330, 336 (5th Cir.2003).

Here, the record shows that Mr. Pigott stopped his truck voluntarily, therefore Deputy Gintz did not conduct a traffic "stop" of the Plaintiffs' vehicle.  At that time, Deputy Gintz was in his personal vehicle and the Plaintiffs had no reason to believe they were being pulled over.  Rather, Plaintiffs argue – and the Court agrees – that the seizure of the Plaintiffs began when Deputy Gintz drew his weapon and commanded Mr. Pigott to get out of his truck, because at that point, Mr. Pigott and his children were not free to leave.  *See, e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015), *citing United States v. Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980) (a "person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

Turning now to the first *Terry* factor, the Court must determine whether Deputy Gintz had a particularized and objective basis for suspecting legal wrongdoing by the Plaintiffs at the time of the seizure.  Although the Plaintiffs argue that disputed facts preclude summary judgment on this question, the record shows that Deputy Gintz had the following information available to him at the time he drew his weapon and seized the Plaintiffs: (i) during nighttime hours, an unidentified and unannounced truck had driven slowly onto Detention Center property, made a circle, and then drove slowly away, during a time period when several individuals had been

arrested for throwing contraband over the prison fence;[39] (ii) Deputy Sanchez reported seeing the silhouette of one person in the bed of the Plaintiffs' truck, however, Deputy Gintz observed three individuals, leading to concerns that the truck was transporting an inmate or inmates away from the Detention Center;[40] (iii) while following the truck in his personal vehicle, Deputy Gintz was able to see into the bed of the truck at a red light and realized that the three persons he had observed in the back of the truck were juveniles; and (iv) Deputy Gintz saw Mr. Pigott drive the wrong way down a one-way street, violating La. R.S. 32:78.[41]

---

[39]     § 14:402(E)(5) makes it a crime to introduce contraband into the grounds of a correctional facility, and because the crime is punishable by a term of imprisonment, violation of § 14:402(E)(5) is a felony.  *See State v. Morgan*, 238 La. 829, 847, 116 So. 2d 682, 688 (1959).

[40]     Plaintiff Mya Pigott testified at her deposition that she saw Deputy Gintz sitting outside the Detention Center when they drove in the parking lot.  Given that it was dark outside and Mya had never met Deputy Gintz, this claim seems suspect – especially in consideration of the other testimonial and circumstantial evidence.  However, even if true, it does not create a genuine dispute of material fact.

Even if Deputy Gintz had been sitting outside, there is undisputed evidence that Deputy Sanchez called Deputy Gintz to tell him he had seen the truck enter the parking lot and that there was one person in the bed of the truck.  Thus, at the time of Mr. Pigott's seizure, Deputy Gintz's observation that three persons were in the back of the truck were inconsistent with those of Deputy Sanchez and gives credence to Deputy Gintz's apparent suspicion that one or more inmates may have been leaving the facility in the bed of Plaintiffs' truck.  *See, e.g., United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014) (the facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation but can also arise from the "collective knowledge" of law enforcement entities, so long as that knowledge gives rise to reasonable suspicion and was communicated between those entities at the time of the stop), *citing United States v. Ibarra–Sanchez,* 199 F.3d 753, 759 (5th Cir.1999) ("Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.").  *United States v. Ibarra–Sanchez,* 199 F.3d 753, 759 (5th Cir. 1999).  Further, by the time the seizure occurred Deputy Gintz had personally observed Mr. Pigott drive the wrong way down a one-way street, which ultimately gave Deputy Gintz reasonable suspicion to effect a traffic stop.

[41]     The violation of La. R.S. 32:78 independently provided Deputy Gintz with reasonable suspicion to conduct a *Terry* stop.

Given this scenario, the Court concludes that Deputy Gintz has identified specific and articulable facts that led him to believe that the Plaintiffs were involved in criminal activity at the time of the seizure.  It is undisputed that the Rapides Parish Sheriff's Office had recently experienced problems with individuals throwing contraband over the Detention Center fence.  It is further undisputed that, at the time he got into his unmarked vehicle to follow the Plaintiffs, Deputy Gintz had conflicting information concerning how many people were in the bed of the truck, which justifies his initial pursuit of the truck.  Although Deputy Gintz was subsequently able to confirm that the persons in the bed of the truck were juveniles, and therefore, it was unlikely they were escaped inmates from the Detention Center, he still had reasonable suspicion to believe the people in the truck had thrown contraband over the facility fence.  The Court finds that these circumstances, along with the fact that Mr. Pigott had committed a traffic violation while driving, were sufficient to create a reasonable suspicion in the mind of Deputy Gintz that the Plaintiffs had driven on Detention Center property to engage in illegal activity.  Cognizant that "due weight must be given ... to the specific reasonable inferences which [Deputy Gintz] is entitled to draw from the facts in light of his experience," *Pack*, 612 F.3d at 352, *citing Terry*, 88 S. Ct. at 1883, the Court finds that Deputy Gintz's seizure of the Plaintiffs was reasonable at its inception.[42]

---

[42]    Plaintiffs argue that Deputy Gintz observed this traffic violation only after "follow[ing] Mr. Pigott's truck at night for several miles" based upon the mistaken belief that "Mr. Pigott had introduced contraband into the Detention Center by throwing it over the fence."  [Doc. 41, pp. 19–20].  But the fact that Deputy Gintz was following the Plaintiffs' truck because of his mistaken belief that they had thrown contraband over the fence is immaterial to the Plaintiffs' unlawful seizure claim.  *See United States v. Sanchez-Pena*, 336

The second step under *Terry* examines whether Deputy Gintz's subsequent actions were reasonably related in scope to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. *See United States v. Rodriguez*, 802 F. App'x 90, 93 (5th Cir. 2020) (under *Terry*, "[i]f the stop was justified [at the outset], [a] court determines in the second step whether 'the officer's subsequent actions were reasonable.'").  After considering the allegations in a light most favorable to the Plaintiffs, the Court concludes that Deputy Gintz's subsequent actions were reasonably related in scope to the circumstances that justified the stop. It is undisputed that – whether Deputy Gintz pointed his gun at the Plaintiffs or held it in a low-ready position – Deputy Gintz's gun was raised for mere minutes and was only "swung" in the direction of the children for a "second."[43]  Deputy Gintz testified that his gun was unholstered because he was outnumbered and could not see into the back seat of the truck and therefore did not know how many individuals were inside the truck.[44]  At this point, Deputy Gintz's use of his weapon was reasonable to protect his own safety.  Once Deputy Lacaze arrived on the scene wearing his body camera, the remainder of the detention is captured on video.  The body camera video shows that once Deputy Lacaze patted down Mr. Pigott, Deputy Gintz holstered his gun, the Plaintiffs were told to lower their hands, and Mr. Pigott was given an opportunity to

---

F.3d 431, 437 (5th Cir. 2003) ("An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."), *citing Whren v. United States*, 517 U.S. 806, 812–13 (1996).

[43]      *See* Deposition of Mya Pigott.  [Doc. 29-6, p. 62]; *see* Deposition of K.P.  [Doc. 29-7, p. 60].

[44]      *See* Deposition of Paul Gintz.  [Doc. 41-5, pp. 105-109, 113].

explain why he had driven onto Detention Center property.[45]  Thus, at the point that Deputy Gintz had backup on the scene, he holstered his gun.  Mr. Pigott's explanation for his presence at the Detention Center satisfied both Deputy Gintz and Deputy Lacaze, and the seizure ended with no handcuffing, no arrests, and no injuries.[46]  The entire exchange from the time Deputy Lacaze arrived at the scene until the Plaintiffs were permitted to leave lasted eight minutes.  Under these facts and circumstances, the Court concludes that the Plaintiffs were not seized for an unreasonable amount of time, and Deputy Gintz's actions were reasonably related in scope to the circumstances that justified the *Terry* stop.  Considering the foregoing, and based on this Court's review of the entirety of the record, including the applicable jurisprudence, the briefing of the parties, the deposition testimony, and the body camera footage, the Court concludes that Deputy Gintz is entitled to qualified immunity on the Plaintiffs' unlawful seizure claim.

### B.  <u>Excessive Force</u>

The Fourth Amendment "creates a right to be free from excessive force during a seizure." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017).  A plaintiff asserting a claim of excessive force must demonstrate: (i) the existence of an injury; (ii) resulting "directly and only from a use of force that was clearly excessive," and (iii) the "excessiveness of [the force] was clearly unreasonable."  *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009).  The reasonableness of an officers'

---

[45]     *See* body camera video.

[46]     *Id.*

conduct cannot be judged with the benefit of hindsight but must be assessed from the viewpoint of a reasonable officer on the scene at that very moment. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989).  Indeed,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396, *cited in Muslow v. City of Shreveport*, 491 F. Supp. 3d 172, 184 (W.D. La. Sept. 30, 2020).

Here, Deputy Gintz seeks summary judgment on the Plaintiffs' excessive force claim on grounds of qualified immunity.  As stated above, in determining the application of qualified immunity, federal courts must engage in a two-step analysis.  First, they must assess whether a statutory or constitutional right was violated under the facts alleged. *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004).  Second, courts must determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* (citations and quotations omitted).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (citations and quotations omitted).  There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and quotations omitted).  The

two steps of the qualified immunity inquiry may be performed in any order. *Pearson*,

555 U.S. at 236, 129 S. Ct. 808.

In excessive force cases, "the second prong of the analysis is better understood

as two separate inquiries: whether the allegedly violated constitutional rights were

clearly established at the time of the incident; and, if so, whether the conduct of the

defendants was objectively unreasonable in light of that then clearly established law."

*Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citations and quotations

omitted). "If officers of reasonable competence could disagree as to whether the

plaintiff's rights were violated, the officer's qualified immunity remains intact." *Id.*

The Supreme Court has explained:

"We have repeatedly told courts ... not to define clearly established law
at a high level of generality...."

**The dispositive question is "whether the violative nature of
*particular* conduct is clearly established." *Ibid.* (emphasis
added). This inquiry "must be undertaken in light of the specific
context of the case, not as a broad general proposition."** *Brosseau
v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (*per
curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150
L.Ed.2d 272 (2001)). Such specificity is especially important in the
Fourth Amendment context, where the Court has recognized that "[i]t is
sometimes difficult for an officer to determine how the relevant legal
doctrine, here excessive force, will apply to the factual situation the
officer confronts."

*Mullenix*, 577 U.S. at 12, 136 S. Ct. at 308.

In determining what constitutes clearly established law, this Court first looks

to Supreme Court precedent and then to Fifth Circuit precedent. *Shumpert v. City of

Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018), *citing Morgan v. Swanson*, 659 F.3d 359,

372 (5th Cir. 2011).  If there is no directly controlling authority, this Court may rely on decisions from other circuits to the extent that they constitute "a robust 'consensus of cases of persuasive authority.'"  *Shumpert*, 905 F.3d at 320, *citing Morgan*, 659 F.3d at 372.  Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.  This is true even when the circuit split developed *after* the events in question.  *Morgan*, 659 F.3d at 372.

Finally, in the context of excessive force, courts must judge the reasonableness of an officer's conduct by taking into account the "tense, uncertain, and rapidly evolving" circumstances in which officers must often "make split-second judgments ... about the amount of force that is necessary in a particular situation."  *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (internal citations omitted).  From this "on-scene perspective" rather than the "20/20 vision of hindsight," courts should examine the objective reasonableness of an officer's belief that a certain degree of force was lawful under the circumstances.  *Bush*, 513 F.3d at 502.  The "reasonableness" of an officer's use of force must be "judged from the perspective of a reasonable officer on the scene, and only the facts then knowable to the [officer] may be considered."  *Crane v. City of Arlington, Texas*, 2022 WL 4592035, at *5 (5th Cir. 2022); *see also Craig v. Martin,* 49 F.4th 404, 410 (5th Cir. 2022) (an officer's conduct must be assessed "with[out] the 20/20 vision of hindsight.").  A court considering the constitutional propriety of a given use of force must therefore "[pay] careful attention to the facts and circumstances of each [] case," including: (i) the severity of the crime at issue; (ii)

whether a given suspect posed an immediate threat to the safety of the officers or others; and (iii) whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight.  *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017), *citing Graham v. Connor*, 490 U.S. 386, 396 (1989).

 Here, Plaintiffs allege that Deputy Gintz exercised an unreasonable degree of force by holding Mr. Pigott at gunpoint for several minutes and by pressing the barrel of his gun to the back of his head before threatening to "blow [his] fucking head off."[47] Similarly, with respect to Mya and K.P., Plaintiffs claim that Mr. Gintz used excessive force by pointing his gun at them when they were not suspected of any crime and were not engaged in any resistance."  Deputy Gintz, in turn, maintains that his use of force was not clearly excessive to the need of the situation and was not objectively unreasonable, arguing it was imminently reasonable to use a moderate amount of non-deadly force for the time period during which he waited, outnumbered, for backup to arrive.

In arguing that Deputy Gintz is not entitled to qualified immunity, Plaintiffs rely, in part, on *Flores v. Rivas*, in which a district court considered the constitutionality of an officer brandishing a deadly weapon at compliant suspects or bystanders.  2020 WL 563799 (W.D. Tex. Jan. 31, 2020).  In *Flores* – which was a ruling on a Rule 12(b)(6) motion to dismiss – the plaintiffs claimed, *inter alia*, that two police officers had used excessive force when they forced a minor to the ground; kicked a minor in the leg; shoved a minor's knee into his face; held a minor against

---

[47]    *See* Complaint.  [Doc. 1, ¶¶ 32-37].

a cement post; pointed a gun at minors while yelling "back up motherfucker!;" "flipped, dragged, and slammed" a minor to the ground before handcuffing him; waved a baton at minors; and slammed another minor's face "onto the hot concrete." 2020 WL 563799, at *1 (W.D. Tex. Jan. 31, 2020).   In the *Flores* Complaint, the plaintiffs alleged that the children "did nothing to give a reasonable officer reasonable suspicion or probable cause that they were engaging in any criminal activity" and did nothing "that would give a reasonable officer reasonable suspicion or probable cause that criminal activity was afoot," to justify the officers threatening them with his loaded gun.  *Id.* at pp. 3-4.  The district court therefore held that the officers were not entitled to qualified immunity.  But the facts of *Flores* are patently dissimilar to the facts of this case.  Among other differences, here, Deputy Gintz did not use physical force against any of the Plaintiffs in this matter, and there was reasonable suspicion that illegal activity had occurred at the time Deputy Gintz raised his weapon.

In *Hankins v. Wheeler*, 2023 WL 5751131 (E.D. La. Sept. 6, 2023), the district court considered motions for summary judgment filed by law enforcement officers who argued they were entitled to qualified immunity on the plaintiff's claims of unlawful seizure and excessive force.  In *Hankins*, the plaintiff and his friends were slowly driving around a neighborhood at midnight looking for a lost dog in a BMW registered to the mother of one of the occupants of the vehicle.  *Hankins*, 2023 WL 5751131 at *1.  As they slowly drove along, they hung their heads out of the vehicle trying to find the dog.  The defendants were working a private security detail in New Orleans when one of the officers, who had been asked by the plaintiff and his friends

if he had seen the dog and was skeptical about their reason for being in the neighborhood at that hour, ran a license plate check on the vehicle, which showed that the car was registered to a woman in New Orleans East, approximately ten miles away.  *Id.* at *2.  After observing the movements of the vehicle, the officer pulled the plaintiff over.  *Id.*  The plaintiff alleged that the officer, now joined by another officer, drew their guns and pointed them in the direction of the car.  *Id.*  Distinguishing *Flores*, the district court held that the officers' actions did not constitute excessive force under the circumstances, as follows:

> Defendants argue that Plaintiff suffered a *de minimis* injury that cannot be proved by competent medical evidence; Defendants also argue that Officer Wheeler pointed a flashlight rather than a gun at the occupants of the car.  Without any reference to a weapon, this would be a clear case of a constitutionally permitted *Terry* stop conducted without excessive force.  The question posed by this case, however, is whether the pointing of guns at the car by Officers Wheeler and Pierre, if true, would alter the result and transform this stop into a prohibited seizure in which the officers employed an excessive use of force.

> The Fifth Circuit has held that "pointing a gun can be reasonable given the circumstances, and that the momentary fear experienced by the plaintiff when a police officer point[s] a gun at him" does not necessarily rise to the level of a constitutional violation.  In this case, accepting as true Plaintiffs' allegations that Officers Wheeler and Pierre pointed their weapons at the car for a brief period of time, this would not be sufficient to satisfy the requirements of an unreasonable stop and excessive use of force in the light of the totality of the circumstances, including the type of previous crime in the area, the late hour, the address of the car's registered owner, the slow-moving car with the windows open, and the driver's failure to immediately stop the vehicle when Officer Pierre activated his blue light.

> [ . . . ]

> Plaintiff cites *Flores v. Rivas* for the proposition that "it is objectively
> unreasonable for a police officer to brandish a deadly weapon at …
> compliant subjects." However, in that case, an officer confronted a group
> of children playing outside a recreation center during a birthday party,
> threw one of the children to the ground, pointed his gun and shouted an
> expletive at them. That case is very different than the one at issue here,
> in which Officers Wheeler and Pierre conducted a stop, late in the
> evening, of a motorist and his companions, driving slowly in a car
> registered to a woman who lived 10 miles away.

*Id.* at \*9–10 (internal citations omitted).

Plaintiffs also rely on *Hodge v. Laryisson*, 1998 WL 564263 at \*1 (E.D. La. Sept. 1, 1998), in which the district court considered the motion for summary judgment filed by Keith Billiot, an agent employed by the United States Drug Enforcement Agency, against whom the plaintiff had alleged an excessive force claim. In her complaint, the plaintiff – a police officer herself – alleged that Billiot and several city police officers had burst into her apartment, ordered her to lay on the floor, and handcuffed her. *Id.* Plaintiff further alleged that Billiot pointed his gun at her face and said, "Look, I know you are a police officer. Where is your duty weapon?" *Id.* The officers then proceeded to search for drugs and for an alleged drug dealer in her apartment. The plaintiff alleged that Billiot badgered her "in a coercive and threatening manner" by accusing her of trafficking drugs and threatening to send her to jail. *Id.* The search for drugs and the drug dealer ultimately was unsuccessful. *Id.*

Although the case largely turned on the issue of the "knock and announce" rule, in his motion for summary judgment, Billiot argued, *inter alia*, that he did not point his gun at the plaintiff and that he was entitled to qualified immunity on the

excessive force claim. *Id.* at *5. Finding that the excessive force claim turned on the issue of whether Billiot pointed his gun at the plaintiff, the district court determined that the existence of genuine issues of material fact precluded a finding of qualified immunity, and the court denied Billiot's motion for summary judgment as to the plaintiff's excessive force claim. *Id.*

On appeal,[48] the Fifth Circuit reversed the decision of the district court, finding that, even assuming the plaintiff's version of events, "Billiot's use of his weapon under the circumstances of this drug raid was not objectively unreasonable under the circumstances." *Hodge v. Laryisson*, 226 F.3d 642, *3 (5th Cir. 2000) (unpublished). Therefore, the Fifth Circuit held that Billiot was entitled to qualified immunity on the plaintiff's excessive force claim, and the decision of the district court, denying Billiot summary judgment, was reversed. *Hodge*, 226 F.3d 642 at *3.

In *Martin v. City of Alexandria Municipality Police Dep't*, 2005 WL 4909292 (W.D. La. Sept. 16, 2005), the district court considered a motion for summary judgment filed by three police officers who were sued for, *inter alia*, excessive force after responding to an anonymous tip that reported a potential burglary at a car dealership. *Martin*, 2005 WL 4909292 at *1. The plaintiffs – a father who owned a janitorial services company that provided cleaning services to various commercial businesses in Alexandria, Louisiana, and his two minor sons – were performing cleaning services at around 10:30 p.m. on the night of the incident at a Honda car dealership. *Id.* After receiving an anonymous tip about a suspected burglary at the

---

[48]     Although the Plaintiffs cite the *Hodge* case at the district court level, they did not cite to the Fifth Circuit decision overturning the district court decision.

dealership, police were dispatched to the dealership.  In their Complaint, the plaintiffs alleged that they were forcibly detained and unreasonably questioned at gunpoint for about seven to ten minutes.  *Id.* at \*1.  Although they were not arrested, incarcerated, or physically harmed, the Martins alleged that the manner in which the investigation and questioning were performed by the officers violated their civil rights.  *Id.*

With respect to the Plaintiffs' excessive force claim, the district court explained:

> Viewing the record in the light most favorable to the Martins show that they were questioned at gunpoint by Officer Distefano for only seven to ten minutes, only a short period of time, and at most for the entire twenty minutes Distefano was on the scene.  There is no dispute that the officer-Defendants did not arrest, handcuff, or even physically touch the Martins.  Distefano arrived late at night and stated that he was around thirty yards away from the Martins when he saw them exit the Used Car Office and come onto the porch with objects in their hands. Distefano stated in his Internal Affairs interview that he was in fear for his life when he drew his gun and ordered the Martins to show him their hands and come off the porch.  Once Officer Distefano got closer, asked for and looked at Martin's identification, figured out that the Martins were not burglary suspects and did not have weapons in their hands, Distefano holstered his weapon and no shots were fired.  **Just as in *Hinojosa*,[49] hindsight may show that there was no need to point the gun at the Martins.  Distefano's gun-pointing, however, falls squarely under a display of force for officer safety in the course of duty because it occurred during a valid *Terry* stop late at night from a distance and he reasonably could not identify what objects the Martins had in their hands until he got closer.  Thus, the Martins' hindsight argument fails under *Hinojosa*.**

---

[49]      In *Hinojosa v. City of Terrell, Tex.,* the Fifth Circuit reiterated that not *every* wrongful act of a police officer is redressed by Section 1983, and that Section 1983 imposes liability only for violations of rights protected by the Constitution.  834 F.2d 1223, 1229 (5th Cir. 1988).

*Martin*, 2005 WL 4909292, at *13 (emphasis added).  The Fifth Circuit affirmed on appeal, stating,

> Sympathetic as we might be to the Martins for having been misidentified as burglars by the anonymous informer, and subsequently held at gunpoint during the investigation, the district court thoroughly examined their complaints, and we find no reversible error in the court's findings of fact or conclusions of law.  We therefore AFFIRM the final judgment of the district court essentially for the reasons stated in its opinion.

*Martin v. City of Alexandria*, 191 F. App'x 272, 273 (5th Cir. 2006).

As in *Hankins*, *Hodge*, and *Martin*, here, the Court finds that, even assuming the Plaintiffs' version of events, Deputy Gintz's use of his firearm was not objectively unreasonable under the circumstances.  In addition to all of the information already known to Deputy Gintz – including the potential introduction of contraband into the prison – the Court also finds that Deputy Gintz could not be aware from the beginning of the encounter what level of threat the Plaintiffs might pose to his safety.  When Deputy Gintz approached the Pigott's truck, he was alone and outnumbered and could not see through the windows of the truck but knew that at least three individuals were in the Pigott truck.  Finally, the Plaintiffs have presented no clearly established law that a police officer may not, during the course of an investigatory stop, point his gun at an individual who: (i) had slowly driven onto Detention Center property at night shortly after other individuals had previously been arrested for throwing contraband over the Detention Center's fence; (ii) under circumstances where there was initial confusion as to how many individuals were in the bed of the truck when the truck first entered the property and when it left the property; (iii) had

violated a traffic law as he drove away from the Detention Center; (iv) was driving a truck with dark windows so that the officer could not see into the back seat of the truck and therefore did not know how many additional people were inside the truck; (v) and only for a short period of time while the officer waited for backup.

Therefore, considering the jurisprudence, the arguments of the parties, and the evidence presented in this case, the Court concludes that it did not violate clearly established law for Deputy Gintz to use a moderate amount of non-deadly force (displaying his firearm) for the three-to-five minutes he waited, outnumbered, for backup to arrive, where no shots were fired and no one was arrested or physically touched.  And while hindsight may show that there was no need to point a gun at Mr. Pigott, Deputy Gintz's brandishing his firearm falls squarely under a display of force for officer safety in the course of duty.   Given these particularized facts – even assuming the Plaintiffs' version of events – Mr. Pigott has not shown that Deputy Gintz violated a clearly established right under the circumstances of this case.[50]

With respect to the Plaintiffs' claim that Deputy Gintz is not entitled to qualified immunity on their excessive force claim for pointing his gun at Mya and K.P., who were minors at the time, the Court similarly concludes that Deputy Gintz's

---

[50]     To be clear, the Court does not condone the actions taken by Deputy Gintz on the night of April 17, 2020.  His decision to follow Mr. Piggott in his personal vehicle late at night – without any indication of his law enforcement status – and to then confront Mr. Piggott with his weapon drawn after he stopped his truck showed poor judgment and created a dangerous situation for everybody involved.   Clearly, any investigatory encounter should have been initiated by a marked unit.  But the fact that Deputy Gintz might have violated department policy and exercised poor judgment, alone, is not determinative.   As the Fifth Circuit explained in *Hinojosa*, Section 1983 does not redress every wrongful or imprudent action of a police officer.  834 F.2d at 1229 (internal citations omitted).

actions were reasonable and that the Plaintiffs have not presented jurisprudence showing otherwise.  K.P. testified that Deputy Gintz moved his gun in his direction in a sweeping fashion for approximately one second,[51] while Mya testified that Deputy Gintz pointed his gun at her only after she attempted to jump into the back seat of the truck.[52]  As Deputy Gintz has testified, he did not know who, or what, was in the back seat of the truck at that time.[53]  Considering the potential danger to Deputy Gintz under these circumstances, the Court concludes that Deputy Gintz's actions were not inherently unreasonable.

Finally, the Court finds that, even if Deputy Gintz was not entitled to qualified immunity, the Plaintiffs would ultimately be unable to prevail on the merits of their excessive force claim, as the Plaintiffs have produced no evidence supporting their claims for injuries.  To prevail on a Fourth Amendment excessive force claim under § 1983, plaintiffs must prove: "(1) an injury (2) that resulted directly and only from the use of force that was excessive to the need and (3) that the force used was objectively unreasonable." *Johnson v. Thibodaux City*, 887 F.3d 726, 731 (5th Cir. 2018), *citing Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).

To establish the first element of an excessive force claim, a plaintiff must prove more than a *de minimis* injury.  *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005).  Although courts no longer require "significant injury" for excessive force

---

[51]    *See* Deposition of K.P.  [Doc. 29-7, p. 60].

[52]    *See* Deposition of Mya Pigott.  [Doc. 29-6, p. 62].

[53]    *See* Deposition of Paul Gintz.  [Doc. 41-5, pp. 105-109, 113].

claims, the injury must be more than *de minimis.*  *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir.1999).  "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only."  *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted).  Stated differently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.*

Here, the Plaintiffs allege that they suffered emotional distress, including overwhelming guilt, sadness, anxiety, stress, anger, depression, frustration, sleeplessness, nightmares, avoidance behavior, hypervigilance, and irritability.[54] Mya alleges that she fears sleeping alone, and K.P. alleges that he has "given up on his dream of becoming a game warden because he no longer trusts law enforcement."[55]  The Plaintiffs also allege that K.P.'s school performance and grades have suffered as a result of the incident.[56]  Plaintiffs aver that they are unable to proffer evidence of their psychological injuries because they could not afford medical care to treat them.[57]

---

[54]   *See* Complaint.  [Doc. 1, ¶¶ 53-55].

[55]   *Id.* at ¶¶ 52-56.

[56]   *See* Plaintiffs' Response to Motion for Summary Judgment.  [Doc. 41, p. 25].

[57]   *Id.*

While the Court is mindful of the costs associated with treatment for mental health issues and psychological injury, it is noted that other indicia of psychological injury – including, for example, letters from teachers or report cards evidencing K.P.'s declining academic performance – could have been provided to the Court but were not. In the absence of any evidence beyond mere allegations of psychological injury, the Court finds that the Plaintiffs' excessive force claim would also fail on the merits.

## II.   <u>Bystander Liability</u>

To the extent that Mya and K.P. allege claims for psychological damages based upon witnessing Deputy Gintz threaten Mr. Pigott while holding him at gunpoint, such claims are not cognizable under Section 1983. "[T]here is no constitutional right to be free from witnessing police action," which necessarily means that "bystanders cannot recover [damages caused by] witness[ing] excessive force used upon another." *Crane v. City of Arlington, Texas*, 2022 WL 4592035, at *9 (5th Cir. Sept. 30, 2022); *accord*, *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1168 (5th Cir. 2021) ("Bystander excessive force claims can only succeed when the officer directs the force toward the bystander – that is to say, when the bystander is not really a bystander."). Accordingly, insofar as Mya and K.P. seek so-called "bystander" damages for excessive force allegedly used against their father, Deputy Gintz is entitled to summary judgment as to that claim.

## III.   <u>Punitive Damages</u>

Plaintiffs also seek punitive damages against Deputy Gintz under 42 U.S.C. § 1983 as well as attorneys' fees under 42 U.S.C. § 1988. As an initial matter, the Court

notes that a party must be a prevailing party in a civil rights suit to recover attorney fees under 42 U.S.C. § 1988. *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990), *citing Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S. Ct. 1933, 1938, 76 L.Ed.2d 40 (1983). Because the Plaintiffs are not prevailing parties on their claims against Deputy Gintz, and because the Court finds no violations of their constitutional rights under the Fourth Amendment, they are not entitled to attorneys' fees under Section 1988.

Furthermore, punitive damages may be awarded for a violation of a plaintiff's constitutional rights only when the defendant's conduct "is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." *Williams v. Kaufman County,* 352 F.3d 994, 1015 (5th Cir.2003) (citation omitted). "Reckless indifference has been described by the Supreme Court as 'subjective consciousness' of a risk of injury or illegality and a criminal indifference to civil obligations." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L.Ed.2d 494 (1999) (citation omitted).

Because Plaintiffs' claims fail for the reasons discussed above, they are not entitled to punitive damages in this matter, and in any event, the Court finds no evidence of reckless indifference or callous disregard. For these reasons, the Plaintiffs' claims for attorneys' fees and punitive damages are dismissed.

## IV.   **State Law Claims**

District courts have "supplemental jurisdiction" over claims so related to a federal question "that they form part of the same case or controversy." 28 U.S.C. §

1367(a).  *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1018-19 (5th Cir.), *cert. den.*, 508 U.S. 956 (1993); *Whalen v. Carter*, 954 F.2d 1087, 1097 (5th Cir. 1992). Although the district court retains its statutory supplemental jurisdiction over any related state law claims after dismissing a plaintiff's federal claims, it may choose whether to exercise supplemental jurisdiction.  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009).   "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  *Carlsbad*, 556 U.S. at 639 ("The district courts *may* decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction.").  The "general rule" in the Fifth Circuit is to decline to exercise jurisdiction over supplemental state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial – but that rule "is neither mandatory nor absolute."  *Batiste v. Island Records Inc.*, 179 F.3d 217, 227 (5th Cir. 1999).

28 U.S.C. § 1367(c) enumerates the circumstances in which district courts may refuse to exercise supplemental jurisdiction. Under that statute, the district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or

(4)   in exceptional circumstances, there are other compelling reasons
       for declining jurisdiction.

28 U.S.C. § 1367(c).  The Court's decision to retain supplemental jurisdiction is guided

by "both the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the relevant

factors of judicial economy, convenience, fairness, and comity." *Batiste*, 179 F.3d at

227; *Parker & Parsley Petroleum Co. v. Dresser Ind.*, 972 F.2d 580, 585 (5th Cir. 1992).

"No single factor" in the supplemental jurisdiction analysis is dispositive, and courts

must review all of the factors under the specific circumstances of a given case. *Parker*,

972 F.3d at 587.

       In this case, the Plaintiffs' state law claims do not raise novel or complex issues,

however, the state law claims predominate at this stage of the litigation, because all

federal claims against Deputy Gintz are being dismissed.  *See, e.g., Mendoza v. United

States*, 481 F. Supp. 2d 643, 647 (W.D. Tex. 2006), *adhered to on reconsideration*, 481

F. Supp. 2d 650 (W.D. Tex. 2007), and *aff'd sub nom. Mendoza v. Murphy*, 532 F.3d

342 (5th Cir. 2008), and *aff'd sub nom. Mendoza v. Murphy*, 532 F.3d 342 (5th Cir.

2008) (where court dismissed the federal claims and only supplemental state law

claims remain, the state law claims predominated over the federal claims, and this

factor weighed in favor of declining to exercise supplemental jurisdiction).  Similarly,

the third factor weighs in favor of declining jurisdiction over the state law claims, as

all claims that gave the federal court jurisdiction have been dismissed, and the only

remaining claims against Deputy Gintz are for state law causes of action.  *See Parker*,

972 F.2d at 585 ("Our general rule is to dismiss state claims when the federal claims

to which they are pendent are dismissed."), *citing Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989).

Thus, in consideration of the foregoing factors, the Court declines to exercise its supplemental jurisdiction over the Plaintiffs' state law claims against Deputy Gintz.  These claims will therefore be dismissed without prejudice.

### CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that the MOTION FOR SUMMARY JUDGMENT [Doc. 29] filed by Defendant Paul Gintz is GRANTED.

IT IS FURTHER ORDERED that the Plaintiffs' federal claims arising under 42 U.S.C. § 1983, alleging unlawful seizure and excessive force, as well as their claim for punitive damages and any claim for bystander liability, against Deputy Gintz in his individual capacity, are DENIED and DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the Plaintiffs' state law claims for assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress are DISMISSED WITHOUT PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 14th day of November 2023.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE